**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIAN DAGGETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08 C 3403** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Julian Daggett ("Daggett" or "Claimant"), filed a motion for summary judgment [18] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(I) and 423. Claimant asks this Court to reverse the decision of the Administrative Law Judge and remand for further proceedings. The Commissioner filed a cross-motion for summary judgment [20] requesting that this Court uphold the ALJ's decision. Jurisdiction to review this matter is proper pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Daggett's motion for summary judgment is granted in part and denied in part, the Commissioner's motion is denied, and this case is remanded for further proceedings consistent with this Opinion.

**I.** **PROCEDURAL HISTORY**

Daggett filed applications for Social Security disability insurance benefits ("DIB") on November 24, 1986 and April 15, 1992, but did not pursue those claims. On May 5, 2004, Claimant filed an application for DIB, alleging a disability onset date of January 15, 1984, due to posttraumatic stress disorder, depression, and leg pain. (R. 40). Claimant's date last insured is December 31, 1989. (R. 27). The Commissioner denied Daggett's claim on July 23, 2004. (R. 30). Daggett filed a timely request for reconsideration on September 23, 2004. (R. 36). The Commissioner denied that request on October 19, 2004. (R. 37-40). Thereafter, Daggett requested a hearing. (R. 41). On May 30, 2006, Claimant appeared with counsel at a hearing before ALJ Helen Cropper ("ALJ Cropper" or the "ALJ"). (R. 1325-59).

At the hearing, ALJ Cropper determined that the record before her was incomplete. (R. 1345-46). Claimant's attorney informed the ALJ that the West Side VA Medical Center ("West Side") could not recover Claimant's medical records from 1984 to 1989. (R. 1332-33). ALJ Cropper also noted gaps in the medical records from 1989 to 1991, December 1992 to April 1996, 1999 to December 2001, and limited records existed from 2001 to 2004. (R. 1333-37). As a result, the ALJ informed both Claimant and his attorney that she would need to review all additional medical records before making her decision. (R. 1342, 1345-46, 1357). The ALJ stated that she may schedule a subsequent hearing. (R. 1342, 1350-51).

ALJ Cropper held another hearing on November 21, 2006. (R. 1194-1324). On May 9, 2007, the ALJ issued a decision denying Daggett's claim for benefits. (R. 17-23). On May 17, 2007, Daggett filed a timely request for review. (R. 12-13). The Appeals Council denied that request, and the ALJ's decision became the final decision

of the Commissioner.  (R. 14-16); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).

Daggett subsequently filed this action in the District Court.

## II.    BACKGROUND

### A.    VA Rating Decisions

Dagget submitted records from the Veteran's Administration (the "VA") in support

of his claim for benefits.  On November 1, 1968, Claimant received a 50% service-

connected disability rating ("VA rating").[1]  (R. 1153).  On July 29, 1970, Claimant

requested an increase of his VA rating.  (R. 1151).  After VA doctors conducted an

examination of Claimant, the VA upwardly adjusted his VA rating to 70%.  (R. 1151-52).

On January 30, 1992, Daggett requested another VA rating increase.  (R. 1149).  The

VA granted a rating increase to 80%, based on an evaluation of posttraumatic stress

disorder ("PTSD").  (R. 1148, 1150).  In the most recent VA rating decision, dated May

23, 2000, an evaluator indicated that Claimant had "poor anger management and poor

impulse control."  (R. 1146).  In addition, the 2000 VA rating decision reflected the VA's

grant of "total disability based on individual unemployability."[2]  (*Id.*).  This VA rating

decision further reflected that Claimant had been "unable to secure or follow a

substantially gainful occupation as a result of service-connected disabilities," and that

---

[1] As stated on the VA's website: "Generally a service-connected disability is a disability that VA determines was incurred or aggravated while on active duty in the military and in the line of duty.  A service-connected rating is an official ruling by VA that [a veteran's] illness/condition is directly related to [his] active military service.  Service-connected ratings are established by VA Regional Offices located throughout the country."  VA.gov, Glossary (VA Health Care Eligibility & Enrollment), http://www4.va.gov/healtheligibility/Library/Glossary/#s (last visited May 3, 2010).

[2] *See infra* n.1 for an explanation of "total disability based on individual unemployability."

he last worked in 1984.  (*Id.*).  Lastly, the VA rating decision reflected that Claimant "cannot seek or maintain any employment now or in the foreseeable future."  (*Id.*).

###    B.    Medical Records

Claimant's earliest medical records reflect treatment from July 1988 and are largely illegible.  (R. 146, 148-149).  The legible portions of these medical records reflect that Claimant visited Hines VA Medical Center ("Hines") for a substance abuse evaluation.  (R. 146, 148-149).  An unknown author of a July 14, 1988 consultation sheet wrote that Daggett "has a 20 year history of drug use [and] states he has been using cocaine regularly for [the] past 4 yrs."  (R. 149).  The author also wrote that Daggett spent "approx. $1500/month and uses at least 1-5x/wk, but would use daily when money is available.  Last use was Tuesday 7.12.88."  (*Id.*).  Furthermore, the author noted that Claimant had been unemployed "since 11/86."  (*Id.*).  Lastly, the author found that Claimant was appropriate for admission to the inpatient drug treatment program, but there was no space to admit Claimant at the time.  (*Id.*).

After the July 14, 1988 visit, there is an approximate three-year gap until Claimant's next recorded medical treatment.  According to Dr. M. Bringas ("Dr. Bringas"), on November 2, 1991, Claimant was admitted into the "4S" ward at Hines on an inpatient basis for treatment of depression and "nightmares due to post-traumatic stress disease."  (R. 279).  The doctor diagnosed Claimant with the following: (1) "cocaine dependence;" (2) "major depression, treated;" (3) "chronic nicotine dependence;" (4) "post-traumatic stress disease;" and (5) "upper respiratory tract infection, treated."  (*Id.*).  The doctor indicated that Claimant had PTSD due to "Vietnam memories" and was unable to sleep at night.  (*Id.*).  Dr. Bringas noted that Claimant had

attended few group and individual meetings during treatment.  (*Id.*).  In addition, the doctor described Claimant as a "jobless construction carpenter" since November 1989 who supported himself with "occasional odd jobs."  (*Id.*).  Dr. Bringas also noted that Claimant had used cocaine several times since December 1988 until October 31, 1989, "spending $125.00 daily."  (*Id.*).  On December 1, 1991, Claimant was irregularly discharged for being absent without official leave, prior to completing his treatment. (*Id.*).  Dr. Bringas discharged Claimant "with good response and no complications" and provided him with prescriptions for Haldol [an antipsychotic], Cogentin [an anticholinergic], Tylenol, and Benadryl.  (*Id.*).

Two days later, on December 3, 1991, Claimant was admitted into the "3S" inpatient psychiatry ward at Hines.  (R. 226-27).  During admission, VA staff informed Daggett that his urine would be tested daily for drugs.  (R. 226-27).  Dr. E. Garb ("Dr. Garb") diagnosed Claimant with "organic mood syndrome secondary to substance use [and] cocaine dependence."  (R. 226).  Dr. Garb prescribed Prozac [an antidepressant] to treat his depressive symptoms.  (R. 227).  On December 11, 1991, Claimant's urine tested positive for cocaine, resulting in his irregular discharge from Hines.  (*Id.*).

Approximately one year later, on December 4, 1992, the medical personnel at Hines's 3S psychiatry ward readmitted Daggett for inpatient treatment of his depression and PTSD.  (R. 203-25).  On December 17, 1992, Claimant tested positive for cocaine. (R. 162).  As a result, Claimant was administratively discharged from 3S before completing his treatment.  (*Id.*).  Claimant's psychiatric treatment team transferred him to Hines's substance abuse unit.  (R. 150-202, 420-21).  While in drug treatment, a social worker noted that Claimant "[h]elped in his father's trucking business in

1986–1988 [and] [h]elped his mother rehab old 'HUD' homes from 1988 to 1991." (R. 179). On December 22, 1992, a Hines nurse, indicated that Daggett had "[i]neffective individual coping related to abuse of substances and PTSD [and] could benefit from extended treatment." (R. 184). After Claimant left the hospital grounds in violation of ward policy on January 4, 1993, Dr. L. Mini (Dr. Mini"), Daggett's supervising doctor, and Daggett mutually decided that Daggett had "maximized the benefit" of his substance abuse treatment and would be discharged. (R. 194, R. 420-21).

The medical records indicate that Claimant returned to Hines for substance abuse treatment approximately three years later, on April 12, 1996. (R. 389-431). In connection with that admission, Claimant's treatment team completed a substance abuse patient assessment and developed a treatment plan. (R. 398-407). As reflected in the assessment, Claimant reported that he worked "full time (40/hrs/wk)" for the past three years. (R. 400). Claimant also stated that, prior to his treatment for drug abuse, he was last sober six months earlier. (R. 401). In addition, Claimant reported that within the last 30 days, he had experienced serious depression; serious anxiety or tension; trouble understanding, concentrating or remembering; trouble controlling violent behavior; and serious thoughts of suicide. (R. 404). The treatment plan for Claimant's "PTSD, flashbacks, nightmares, [and] agitation" included providing emotional support and reassurance; encouraging Claimant to verbalize feelings and thoughts; referral to the PTSD clinic; and providing medication. (*Id.*). Dr. P. Desai ("Dr. Desai") noted that Claimant used $100–$200 of cocaine per day "to deal with symptoms" of PTSD. (R. 387). On April 29, 1996, his treatment team discharged Claimant to the outpatient "mental hygiene" clinic. (R. 388).

Claimant's next psychiatric hospitalization occurred approximately one year later, on April 23, 1997, when he was admitted to West Side. (R. 633-36). Dr. William Mahoney ("Dr. Mahoney") diagnosed Claimant with (1) "Polysubstance dependence (cocaine, opiates, alcohol);" (2) "Asthma by history;" (3) "Multiple bone/tendon injuries lower extremities;" and (4) "Rule out posttraumatic stress disorder." (R. 633). The doctor noted that Claimant had difficulty managing his anger while in treatment. (R. 635). Dr. Mahoney also noted that Claimant was scheduled for discharge from West Side on May 12, 1997, in order to enter the 35-day PTSD treatment program at North Chicago VA Medical Center ("North Chicago"). (*Id.*). On May 9, 1997, Claimant received a pass to go to the Veterans Commission to obtain funds for travel to North Chicago for that program. (*Id.*). Claimant did not return to West Side and was irregularly discharged for being absent without leave. (R. 635-36).

Claimant's next psychiatric admission occurred a year-and-a-half later. (R. 378-79, 548-62). On October 11, 1998, Dr. Barbara L. Benton ("Dr. Benton") noted that Claimant arrived at Hines stating that he has "two choices, I will kill somebody or somebody will kill me." (R. 378). Dr. Benton also indicated that Claimant had been the recent target of an attempted robbery. (*Id.*). Claimant reported "being clean" since 1993, but that he smoked "speed balls [cocaine and heroin]" worth approximately $4,000 for two weeks after the attempted robbery. (R. 378; 562). Dr. Pravin Bhatt ("Dr. Bhatt"), the attending psychiatrist, diagnosed Claimant with PTSD and "poly-substance abuse." (R. 1120). Dr. Bhatt prescribed individual and group therapy, and Trilafon [an antipsychotic medication]. (R. 1121). On October 19, 1998, Dr. Bhatt indicated that Daggett "is presenting with October anniversary of Vietnam." (R. 554). By October 21,

1998, Dr. Benton noted that Claimant was ready for discharge by responding "very well" and achieving "full benefit" of inpatient treatment. (R. 549). The next day, Claimant received a regular discharge from Hines. (R. 378-79).

On November 13, 1998, Claimant returned to Hines. (R. 377, 533-48). Dr. Bhatt indicated that Claimant was experiencing flashbacks of Vietnam and may have been using illicit drugs. (R. 377). On November 23, 1998, Daggett informed a medical student that he felt "hopeful for the first time ever" and "excited" about entering North Chicago's 35-day PTSD treatment program. (R. 539). A discharge planning note written by a social worker stated that "Vet is in need of PTSD [treatment] as he continues to have flashbacks." (R. 534). Claimant was discharged from Hines on December 4, 1998, in order to attend a screening interview at North Chicago. (*Id.*).

On December 4, 1998, Dr. John J. Schaut ("Dr. Schaut"), a psychologist, screened Claimant for admission into North Chicago's Stress Disorder Treatment Unit ("SDTU") for its 35-day PTSD treatment program. (R. 912-13). At that time, Daggett reported that he was "self-employed as a journeyman carpenter," but had not worked for the previous three weeks due to his PTSD. (R. 912). On December 10, 1998, Claimant began the program. (R. 830-33). As part of his treatment, Claimant attended individual and group therapy sessions. (R. 903). Dr. Remedios N. Galang ("Dr. Galang"), the attending psychiatrist, noted that Claimant had been diagnosed with PTSD as early as 1985 and participated in intermittent outpatient PTSD treatment since that time. (R. 831). Dr. Galang further noted that Claimant's admission to North Chicago's day program marked his first inpatient PTSD treatment. (*Id.*). Claimant did not complete the program. (R. 833). Instead, on January 5, 1999, the treatment team irregularly

discharged Daggett for failing to return after receiving temporary leave to spend time with his family during the holiday season.  (*Id.*).

On January 28, 1999, Claimant returned to the 3S psychiatry ward at Hines and complained of homicidal thoughts after reportedly spending twelve days in jail.  (R. 521-33, 1072-90).  Dr. Bhatt diagnosed Daggett with PTSD and substance abuse.  (R. 1088).  The doctor recommended restarting psychotropic medication, individual and group therapy, milieu therapy, and the PTSD program.  (*Id.*).  On February 4, 1999, Dr. Bhatt opined that Claimant continued to "progress well" and recommended that he continue with psychotropic medications and psychotherapy.  (R. 1076, 1086). According to a February 5, 1999 note by Dr. Kiran F. Siddiqui ("Dr.  Siddiqui"), a medical resident, Claimant demanded to leave treatment after being arrested in the VA cafeteria for fighting.  (R. 1075).  The note reflected that Dr. Siddiqui prescribed Haldol and Ativan [an anti-anxiety medication] to treat Daggett's agitation.  (*Id.*).  The next day, however, Claimant signed himself out of treatment.  (R. 1074-75).  On February 6, 1999, Claimant was irregularly discharged for leaving against medical advice.  (R. 1073-74).  A Hines social worker noted that Daggett "has a poor history of compliance" with treatment and follow up, but that he planned to follow up at North Chicago for outpatient PTSD treatment.  (R. 1072).

On February 11, 1999, Claimant received treatment from the Acute Rehabilitation Unit ("ARU") at North Chicago.  (R. 864-88).  The attending psychiatrist, Dr. Elizabeth Wood (Dr. Wood"), indicated that Claimant had "low grade depressive symptoms" and "emotional management issues."  (R. 886).  In a February 12, 1999 progress note, Dr. Wood stated that Claimant's use of Zoloft over the past year yielded "good results" in

stabilizing his mood and managing his anger. (*Id.*). Dr. Wood recommended continued use of Zoloft. (*Id.*). During treatment in the ARU, Virginia C. Edingburg ("Ms. Edingburg"), a psychology technician, noted that Claimant reported that he was "clean" from 1970 to 1990 and from 1991 to 1998. (R. 877). However, when asked about the years he reported not using illicit drugs in a group therapy session, Claimant stated: "Maybe I did use in some of those years that I reported as being clean time. I have used in treatments before." (*Id.*). Ms. Edingburg noted that Claimant's statement "directly conflicts" with his medical records from Hines, West Side, and private treatment centers for the years 1988, 1991–1993, and 1995–1998. (*Id.*).

On March 10, 1999, the director of the ARU noted that Claimant's treatment team granted him a one-day, "therapeutic" pass to leave treatment to attend a family funeral. (R. 869). The next day, Claimant called Lynne Vaughn ("Ms. Vaughn"), a social worker at North Chicago, "in great distress." (R. 866). He informed the social worker that the funeral had triggered flashbacks to his experiences in Vietnam. (*Id.*). Ms. Vaughn assessed that Claimant was in a "very agitated, labile mood alternating between tears, anger, and fear." (*Id.*). Claimant did not return to the ARU on March 11, 1999, as expected. (*Id.*). According to Ms. Vaughn's discharge note dated March 12, 1999, Claimant's wife informed Ms. Vaughn that Claimant relapsed and would not be returning to treatment. (R. 865-66).

On April 7, 1999, Claimant was admitted to the North Chicago acute psychiatric unit for PTSD problems and homicidal ideation. (R. 845-64). That day, Dr. Medeia Gartel (Dr. Gartel"), a psychiatric resident, noted that someone tried to rob Claimant. (R. 862). The doctor stated that Claimant spent two days "on the streets" looking for the

-10-

robber and when he found him, broke the robber's jaw.  (*Id.*).  According to the doctor's admission note, Claimant reported that he could not control his urge to "finish the g[u]y" and that the only way for him to avoid murder was to be "locked up."  (*Id.*).  Dr. Gartel diagnosed Claimant with PTSD and "chronic impulse control disorder."  (R. 863).  The doctor prescribed Ativan to treat Claimant's agitation.  (*Id.*).  Additionally, Dr. Gartel noted that Daggett "presently works as a taxi driver."  (R. 862).

Claimant met with his treatment team on April 8, 1999.  (R. 855).  A treatment nurse noted that, during the meeting, Claimant expressed "difficulties revealing himself to strangers" and "coping with the guilt of being [the] lone survivor of his patrol" in Vietnam.  (*Id.*).  Claimant indicated that he had trouble sleeping and that he needed "a plan on how to survive in life."  (*Id.*).  Daggett's treatment team prescribed Trazodone. (*Id.*).  On April 12, 1999, Dr. Purna Chalansani ("Dr.  Chalansani"), an attending psychiatrist, noted Claimant's request for an increased dosage of Motrin for his ankle pain.  (R. 850).  The doctor also noted that Claimant wished to return to North Chicago's SDTU.  (*Id.*).  On April 16, 1999, Dr. Schaut met with Claimant to discuss treatment options following discharge from the acute psychiatry unit.  (R. 846).  Dr. Schaut discussed various housing options with Claimant, and the doctor agreed to facilitate referral to an appropriate program.  (*Id.*).  On April 18, 1999, Claimant reported continued difficulties sleeping, but denied having hallucinations.  (*Id.*).  He agreed to a trial of Mellaril [an antipsychotic] to help him sleep.  (*Id.*).  On April 19, 1999, Claimant was irregularly discharged for not returning to treatment after leaving without authorization.  (R. 845).

Claimant was admitted to West Side on July 6, 1999.  (R. 631-32).  At the time of

admission, Daggett's urine tested positive for cocaine. (R. 632). Dr. W. Biber ("Dr. Biber"), a staff psychiatrist, noted Claimant's report of an "exacerbation of his PTSD symptoms." (R. 631). The doctor also noted that Daggett "expressed a fear that he could lose control and become violent," and reported a fight over the July 4th holiday. (*Id.*). Dr. Biber diagnosed Claimant with "probable PTSD" and "cocaine dependency." (*Id.*). Claimant's treatment team recommended individual and group therapy, and that he start Prozac every morning and Trazodone at bedtime for sleep. (R. 631-32). Claimant's treatment team increased the dosage of Trazodone from 50 mg to 100 mg on July 7, 1999, and to 150 mg on July 9, 1999. (R. 632). On July 12, 1999, Daggett was irregularly discharged due to his refusal to participate in group therapy. (*Id.*).

Nearly two weeks later, on July 24, 1999, Claimant returned to Hines and was readmitted to the 3S psychiatry ward for treatment due to his PTSD and homicidal thoughts. (R. 1043-72). Claimant informed a medical resident that his wife accused him of infidelity with her niece. (R. 1071). He further reported that he went to the niece's home "wanting to beat her" and felt that he could not control himself. (*Id.*). Dr. Bhatt recommended that Claimant start taking Serzone [an antidepressant] and Trazodone, and attend therapy. (R. 1072). On August 2, 1999, Mark Butterfly, a medical student, noted that "Mr. Daggett admits it is in his daily routines . . . where he needs the most help coping with his present condition." (R. 1050-51). That same day, Dr. Bhatt reassessed Claimant's treatment plan and noted that Claimant "has begun to show consistent improvement in his state of anger and agitation." (R. 1053). Consequently, the doctor elected to initiate discharge planning. (R. 1053). On August 5, 1999, a nurse noted Daggett's report, in group therapy, that "he ha[d] been coming to

Hines since 1970 with the same problem." (R. 1048). The nurse indicated that Claimant characterized this admission as "different" from his previous treatments, as it marked the first time that he had been admitted drug free. (*Id*.). Furthermore, the nurse noted that Claimant believed that "this [was] a very important step for him and that now he can finally move on." (*Id*.). Two days later, on August 7, 1999, Claimant's wife informed him of his nephew's incarceration. (R. 1045). In response, Claimant demanded to leave treatment to "bail [his] nephew out of jail and [to] make a statement to police on [his nephew's] behalf." (*Id*.). Claimant was discharged against medical advice on that same day. (*Id*.).

Peyton R. Keller, Jr. ("Mr. Keller"), a social worker at Hines, documented Claimant's status through an outreach effort at a homeless shelter in Chicago on February 25, 2000. (R. 1042-43). Mr. Keller noted that Claimant had been homeless for at least thirty days. (R. 1043). He indicated that Daggett had dental problems, a history of substance abuse, and had spent time in jail. (*Id*.). Mr. Keller further noted that Daggett received outpatient treatment for his PTSD at the shelter and at the Oak Park veteran center with a Dr. Jean Douglas ("Dr. Douglas").[3] (R. 1043). In addition, Mr. Keller assessed that Daggett may be a candidate for "HCHV" [health care for homeless veterans], depending on his "med compliance and commitment to treatment." (*Id*.). Lastly, Mr. Keller noted that he would "discuss placement with Dr. Douglas" on Daggett's behalf. (*Id*.).

Claimant's next hospitalization occurred, on December 14, 2001. (R. 628-30).

---

[3] The record before this Court does not include any medical records from the Oak Park veteran center or Dr. Douglas.

Dr. Jed A. Haake ("Dr. Haake"), a staff physician, indicated that Daggett arrived at West Side presenting with "homicidal ideation." (R. 628). Daggett was admitted into the Acute Care Psychiatric Unit for inpatient treatment of his PTSD. (*Id.*). At the time of admission, Dr. Haake rated Daggett with a Global Assessment of Functioning ("GAF")[4] scale score of 25. (*Id.*). The doctor diagnosed Claimant with PTSD and "polysubstance dependence, in remission." (*Id.*). Dr. Haake indicated that Claimant had a "history of borderline personality disorder." (R. 629). Furthermore, the doctor noted that Claimant was "100% service-connected for psychiatric illness" and received $2,100 per month in VA benefits. (*Id.*). Dr. Haake also noted that when instructed to attend educational group therapy, Daggett refused and became angry toward VA personnel. (*Id.*). Dr. Haake concluded that Daggett's prognosis was "poor." (R. 630). Dr. Haake opined that Daggett had a "very difficult time forming a treatment alliance with caretakers." (*Id.*). At the time of Claimant's irregular discharge on December 15, 2001, the doctor assigned Daggett a GAF score of 25. (*Id.*).

That same day, Claimant proceeded to Hines and was admitted into the "2N" ward for inpatient psychiatric treatment. (R. 983-1042). Claimant reported a recent "flashback" and a pain level of "five" out of ten. (R. 1038). Claimant also reported that

---

[4] The GAF scale is a tool used by clinicians to rate an individual's overall psychological, social, and occupational functioning on a 100-point "hypothetical continuum of mental health-illness." *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32-34 (4th ed. 2000). It excludes physical or environmental impairment. *Id.* at 34. For reference, a scale score between 21-30 suggests an individual's "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends)." *Id.* at 34 (emphasis in original).

he was the victim of a robbery attempt four days earlier. (R. 1033-34). He stated that since the incident, he had been unable to sleep and his anger had become "unmanageable." (R. 1034). On December 17, 2001, Dr. Rajani Sharma ("Dr. Sharma"), medical chief of the day treatment program, diagnosed Claimant with PTSD accompanied by an "impulse control problem." (R. 1027). Dr. Sharma opined that the robbery incident "triggered his flashbacks, anger, [and] insomnia, and has made him vulnerable." (R. 1026). The doctor noted Claimant's history of "poly-drug dependence" and chronic pain from injuries to his legs, left arm, neck, and head. (R. 1025-27). Claimant's treatment team recommended that Daggett restart Gabapentin [an analgesic] and ibuprofen to treat his pain symptoms, and trazodone, Sertraline [an antidepressant], and Risperidone [an antipsychotic] to treat his PTSD symptoms. (*Id.*). Dr. Sharma also recommended that Claimant consider starting Depakote for "better impulse management," and that he continue "cognitive and behavioral therapies." (*Id.*). On December 20, 2001, Dr. Sharma opined that Claimant had "improved" due to treatment and was "confronted again with his drug abuse issue." (R. 1007). Furthermore, Dr. Sharma indicated that Claimant was "more open" to realizing the impact of drugs on his behavior. (*Id.*). As a result of Claimant's progress in the 2N psychiatry ward, the doctor referred Claimant to the Substance Abuse Residential Rehabilitation Treatment Program ("SARRTP") for drug treatment. (*Id.*).

On December 27, 2001, Michael G. McCann ("McCann"), a social worker, accepted Claimant into SARRTP, located in the "4S" ward at Hines. (R. 983-992). On January 2, 2001, a SARRTP staff member noted that Claimant had failed to report to his treatment appointments, which resulted in his irregular discharge from the 4S ward. (R.

983). According to McCann, on January 7, 2002, Claimant called the SARRTP residents' pay phone arguing that some of his personal belongings were missing. (R. 981). Claimant threatened to return to the SARRTP unit with a gun to retrieve the missing items. (*Id.*). McCann indicated that the 4S unit and VA police were placed under alert due to Claimant's threats and his noted history of violent behavior. (*Id.*). According to McCann, the residents who spoke to Claimant on the phone "felt that he was under the influence of mood altering drugs." (R. 982). Ultimately, Claimant did not return to the unit. (*Id.*).

The medical records show that starting on June 1, 2004, Dr. John E. Mundt ("Dr. Mundt"), a staff psychologist at the VA's Lakeside outpatient clinic ("Lakeside"), assisted Daggett in completing materials for his social security claim and provided support during the pendency of Daggett's criminal trial. (R. 735, 742-73, 777-78, 780, 786, 794-95, 798, 802, 805). On July 27, 2004, Dr. Mundt opined that Daggett remained "intensely motivated to cope with continued stress of [his] legal situation." (R. 795). The doctor also noted that Daggett's case may be dismissed at the next court date, scheduled for August 2, 2004. (R. 795). Dr. Mundt's progress note, dated September 28, 2004, reflected that Daggett's criminal trial had been continued, and Claimant was "frustrated" by the delays. (R. 786).

On October 27, 2004, Dr. Mundt noted that Daggett had been arrested that morning by VA police and remained in custody. (R. 778). According to Dr. Mundt, Daggett was involved in a verbal altercation in the cafeteria where he "reportedly assumed a hostile stance and suggested non-verbally that he was carrying a weapon." (*Id.*). The doctor informed VA police of Daggett's mental health history, and Daggett

was released, but cited for disorderly conduct. (*Id.*). In his November 9, 2004 progress note, Dr. Mundt's stated that he provided Daggett with "a brief statement for the judge documenting the negative impact that continued delays [were] having on his mental health." (R. 777). At the time, Claimant reported to Dr. Mundt that he intended to seek inpatient PTSD treatment at North Chicago at the conclusion of his criminal trial. (*Id.*).

On December 17, 2004, Daggett appeared at the Hines emergency department and demanded admission. (R. 975-81). A nurse's note reflected that Daggett was experiencing a "PTSD exacerbation," and that he reported feeling like the "point man" on a patrol in Vietnam. (R. 977). The nurse noted that Daggett was "making threats of violence if not admitted" into the 2S psychiatry ward. (R. 980). Dr. Mary H. K. Hanessian (Dr. Hanessian") noted that Claimant could not be admitted at that time due to the lack of open beds. (R. 979). In addition, Dr. Hanessian indicated that security was called to the triage due to Daggett's threats and his history of violent behavior. (*Id.*). Daggett "disappeared" from Hines after security was called. (*Id.*). On December 22, 2004, a social worker noted that Daggett had called reporting that he "eloped" from Hines on December 17 for fear of being committed to the state psychiatric hospital and that he was no longer interested in further treatment there. (R. 975).

In an April 25, 2005 progress note, Dr. Mundt indicated that Daggett had not visited him for several months and "not at all since he reportedly eloped from Hines VA" in December 2004. (R. 743). The doctor indicated that he had no "opportunity to explore events at Hines with [Daggett], nor to alert him that at this point any further mental health contact [at Lakeside] must occur via a formal intake assessment." (R. 743). On May 19, 2005, Dr. Mundt noted that he was able to discuss with Claimant the

circumstances surrounding his December 2004 elopement from Hines. (R. 742). Specifically, the doctor noted that Daggett responded "angrily" and claimed that the staff at Hines were "being racist" for not admitting him at the time. (*Id.*). Dr. Mundt also noted that Daggett continued to function under "severe stress" due to his pending criminal trial and the "threat of lengthy incarceration if convicted." (*Id.*). On July 13, 2005, Daggett called Dr. Mundt to express his anger and frustration that his trial had been postponed yet again. (R. 735). At that time, the doctor wrote the following: "[Daggett] acknowledged that he has been 'on the streets' for [the] past 13 days, and has been drinking and using cocaine." (*Id.*). Furthermore, Dr. Mundt opined that in Daggett's situation, inpatient treatment would have "NEGATIVELY impacted" his "mental status" and also carried the risk that Daggett would miss his next court date on July 25, 2005. (*Id.*) (emphasis in original). The doctor recommended that Daggett "strategically retreat" to his apartment to "bunker in" for the time being. (*Id.*). Dr. Mundt further opined that Daggett's history of "violent/threatening behavior" had "severely impacted his ability" to get treatment. (*Id.*).

On September 30, 2005, Daggett informed Dr. Mundt's that the attempted murder charge had been dropped. (R. 714). The doctor noted that Daggett's "legal case ha[d] been an ongoing stressor for this volatile [patient] for the past several years, and [was] now finally resolved in his favor." (*Id.*). At the time, Daggett expressed his intent to seek a formal evaluation and outpatient treatment of his PTSD, and his "longer-term goal" to enter the inpatient PTSD day program offered at North Chicago. (*Id.*).

### C.    Vocational Expert's Testimony

Timothy Bobrowski, Ph.D, ("VE Bobrowski" or the "VE") appeared and testified as the vocational expert at the November 21, 2006 hearing. (R. 1308-15). VE Bobrowski considered the relevant time as 1974 to the present. (R. 1309). ALJ Cropper informed the VE that Claimant was 37 years old at the alleged onset date, 43 years old at the date of last insured ("DLI"), and 60 years old as of the date of the hearing. (*Id.*). VE Bobrowski testified that under the *Dictionary of Occupational Titles* ("DOT"), Claimant's work as a "vet rep" lines up with a job developer position; a high level, semi-skilled job that calls for light exertion. (*Id.*). The VE further testified that military service is ignored for vocational assessment purposes because "no real jobs in [the DOT] . . . line up with the duties performed" as a soldier. (R. 1310). VE Bobrowski opined that Claimant's skills relative to a job developer would also transfer to sedentary occupations, such as a job placement specialist and employment specialist. (R. 1310). The VE noted that Claimant's transferrable skills remain valid for 15 years "by definition with Social Security." (R. 1311).

ALJ Cropper asked VE Bobrowski to consider a hypothetical individual with the same age, education, and past relevant work as Claimant. (*Id.*). The ALJ then asked the VE to assume that the hypothetical individual had the residual functional capacity ("RFC") to perform a full range of light work with the following limitations: (1) the individual could not do repetitive pushing or pulling against resistence with the left upper extremity; (2) he could not climb ladders, ropes, or scaffolds; (3) he could not work on moving or unstable surfaces; and (4) he could not be exposed to unprotected heights or unguarded hazardous equipment. (R. 1311-12). VE Bobrowski opined that the hypothetical individual could perform Claimant's past work as a veteran's

representative. (*Id.*). The VE testified that in the Chicago region, there are other positions that the hypothetical individual could perform, including 1,400 usher positions; 1,500 grader and sorter positions; and 5,000 production inspector positions. (R. 1312-13).

If the hypothetical person with the same limitations were limited to work at the sedentary level, VE Bobrowski opined that the hypothetical person could still perform the jobs to which Claimant's skills would transfer. (R. 1312). The VE testified that such a person could also perform work as a production inspector (1,200 positions), grader and sorter (1,300 positions), and surveillance system monitor (2,000 positions). (R. 1313). VE Bobrowski noted that the stated occupations do not require significant contact with the general public, except for the usher position. (*Id.*). The VE then explained that the production inspector position and the grader and sorter position are considered bench work with occasional interaction with co-workers, while the surveillance systems monitor position involves "very occasional" interaction with others. (*Id.*). If the hypothetical person were frequently distracted, the VE opined that no competitive employment would be available for that person. (R. 1314).

Next, Claimant's attorney asked VE Bobrowski to assume additional modifications to the ALJ's hypotheticals. (R. 1314). Claimant's attorney asked the VE whether the hypothetical person could perform the stated jobs if he were prone to inappropriate behavior that ran "an extreme risk of conflict" with authority figures at least once a week. (R. 1314-15). In response, VE Bobrowski opined that such a person could not perform the jobs he discussed. (R. 1315).

### D. Other Documentation

On June 15, 2004, Claimant's treating psychologist, Dr. Mundt, submitted various materials to the Bureau of Disability Determination Services in connection with Daggett's Social Security DIB application, including a "psychiatric report" and letter. (R. 586-89, 625-26). In the psychiatric report, Dr. Mundt opined that "chronic symptoms of PTSD impair [Daggett's] day-to-day functioning such that sustaining either work or relationships is very difficult for this man." (R. 589). In the letter, the doctor indicated that Daggett remained "housebound" on many occasions for several days due to his PTSD symptoms. (R. 625). Dr. Mundt classified Daggett's daily functioning as "highly erratic at best" and concluded that Daggett was unable to "sustain any activity or involvement across time with the kind of consistency that would be required by even the most undemanding of jobs." (R. 626).

## E.    Claimant's Testimony

### 1.    May 30, 2006 Hearing

Claimant appeared with counsel and testified at the May 30, 2006, hearing before ALJ Cropper. (R. 1338-59). Because the ALJ determined that the record before her was incomplete, she focused her questioning on Claimant's treatment history since 2001. (*Id.*). Specifically, the ALJ asked Claimant whether he received treatment during a period of incarceration between 2001 and 2003. (R. 1338). He testified that he only received his medication, but no treatment. (*Id.*). Claimant stated that after his release from incarceration, he stayed at a nursing home in Joliet, Illinois for approximately four weeks. (R. 1339-40). Claimant did not receive any treatment during his stay at the nursing home. (R. 1339-40).

Daggett testified that his VA doctors "finally stabilized" the medication regimen to treat his PTSD in 2004 or 2005. (R. 1341). He takes 100 milligrams ("mg") of Sertaline [an antidepressant] during the day and 100–150 mg of an unspecified medication at night. (R. 1341). These medications "ha[ve] been working for the last year or so," and as a result, Daggett has not felt the need to participate in a day treatment program. (*Id.*). However, he stated that he is on a waiting list to join the "PTSD group." (*Id.*). Daggett has been taking his medications regularly and feels "okay" to function on a daily basis. (*Id.*).

### 2. November 21, 2006 Hearing

Daggett again appeared with counsel and testified at the November 21, 2006 hearing before ALJ Cropper. (R. 1210-1308). He was born on June 7, 1946. (R. 1211). At the time of the hearing, Daggett was 60 years old. (*Id.*). He has four adult children and 13 grandchildren. (R. 1211-13, 1282). Daggett testified that he has no other sources of income other than his VA benefits of approximately $2,000 per month. (R. 1214). Daggett explained that because of his "unemployability" status, the VA had paid him at the "100 percent rate"[5] since 2002. (R. 1215).

Daggett testified that he has two years of college education. (R. 1294-95). He

---

[5] The VA pays monthly compensation to a veteran who has sustained "service-connected" injuries (e.g., combat-related injuries) based on the veteran's disability rating. *See generally* 38 U.S.C. § 1114(a)-(j) (2006) ("Rates of wartime disability compensation"). A veteran's monthly compensation may increase if the VA grants total disability based on individual unemployability ("TDIU"). *See* 38 C.F.R. § 4.16 (2009). Here, a review of the record shows that the VA granted Daggett TDIU effective February 9, 2000, thereby entitling him to payment at the 100 percent rate. (R. 674-77). For reference, monthly payment for 100 percent disability for the year 2000 was $2,036; for the year 2006, the amount adjusted to $2,393. *See* Veterans' Compensation Cost-of-Living Adjustment Act of 1999, Pub. L. No. 106-118, § 2(a)(10), 113 Stat. 1601, 1601; Veterans' Compensation Cost-of-Living Adjustment Act of 2005, Pub. L. No. 109-111, § 2(a)(10), 119 Stat. 2362, 2362.

received a track scholarship from Western Michigan University, but only remained there for one semester because he suffered a knee injury.  (R. 1226).  Daggett stated that he earned "15 credit hours" from his time at Western Michigan University.  (R. 1294-95).  He then returned home to Chicago where he enrolled in two community colleges before being drafted and subsequently deployed to Vietnam. (R. 1226, 1294-95).

Daggett served in the Marines as the leader of a six-man reconnaissance team.  (R. 1272-73).   In Vietnam, while he and his team were out scouting, they "walked into . . . a massive build-up and nobody knew it ."  (R. 1274).  As his team tried to relay the information about the build-up, "an 81 millimeter rocket" landed on their position.  (*Id.*).  Daggett recalled that four members of his team were killed instantly, the fifth member died in his arms, and he suffered serious injuries.  (R. 1251).

As a result of his injuries, Daggett stayed in various hospitals for approximately 18 months.  (R. 1274-75).  He stated that he cannot use his left arm because the bomb explosion severed his ulna median nerve.  (R. 1219).  Daggett has 125 sutures in his left calf and a damaged right ankle.  (*Id.*).  He suffers from PTSD, and claimed that "nobody knew about the PTSD to the Vietnam Vets" for years after returning home.  (R. 1219-20).

Daggett was employed as a "vet rep" with the State of Illinois he said he held from 1974 to 1984.  (R. 1229-32, 1280).  He received three months of training at Roosevelt University, accumulating additional college credit.  (R. 1294-95).  Daggett stated that as a vet rep, he would assist veterans in finding employment by holding seminars and soliciting jobs from companies by phone or in person.  (R. 1229-30).  He worked "from 8:30 to 5:00, five days a week" and "the first eight years [at the job were]

pretty good."  (R. 1229).  However, Daggett had difficulty during the last two years in his position because "they swung the focus from the Vets to everybody."  (R. 1230).  The job became "too big" with "too many added stresses . . . [that he] wasn't prepared to deal with."  (R. 1231).  According to Daggett, he was terminated in 1984 because he "talked back" to a supervisor.  (R. 1231-32).

After his job as a vet rep ended, Daggett "might have worked at a factory here and there but [he] couldn't keep a job."  (R. 1220).  Daggett detailed one particular instance when he became startled by a co-worker that he did not notice working behind him while employed at a factory.  (R. 1270-71).  Daggett stated he "forearmed smashed" the co-worker and consequently, was asked not to return to work.  (R. 1271).  He only worked at that factory for approximately two weeks.  (R. 1220).  Daggett stated that he did not work often because "it is a little tough to get up and push a clock on a daily basis when you've got demons running around in your head."  (*Id.*).

Daggett worked as a driver for his mother's business in 1987 or 1988.  (R. 1222-24, 1288-90, 1305-06).  He explained that his mother rehabbed old buildings and turned them into affordable housing.  (R. 1288-90).  Claimant's mother hired non-union workers to handle the rehabbing, and he shuttled the workers to the construction sites.  (R. 1222-23).  Daggett did not participate in the actual rehab work.  (R. 1222-23).  He became upset because he believed that the workers "would try to steal" from his mother.  (R. 1305).  Daggett became physically violent with a worker, and his mother decided that he was being "a little overly protective" and should stop working for her.  (R. 1222-23, 1306).  Daggett stated that he worked for his mother's business for no more than six weeks.  (R. 1222, 1289).

-24-

Daggett, along with two other individuals, did one or two roofing jobs a week during the summertime.  (R. 1292-93).  When ALJ Cropper asked how much money he made from a roofing job, Claimant replied that he would make "a little more than" $100 for two days of work.  (R. 1293).  He fell from a roof while working at one of these jobs in 1996.  (R. 1224-25).  Daggett stated that he broke both of his legs, both ankles, and his right heel.  (R. 1224).  The biggest roof he worked on was "[t]he one [he] fell off of," and he did not receive payment for that particular job.  (R. 1293-94).

The ALJ questioned Daggett about certain statements, reflected in his medical records, concerning his work history and past substance use.  (R. 1221-24, 1236-44, 1287).  First, the ALJ asked Daggett if he reported being "recently laid off a job," as reflected in a 1991 VA medical record.  (R. 1221).  Daggett testified that he did not remember saying that at the time.  (*Id.*).  Daggett denied telling VA personnel that he worked as a cab driver, or that he worked as a licensed contractor and received "contracts with the City."  (*Id.*).  Moreover, when asked whether he reported to VA doctors that he worked as a "self-employed journeyman carpenter," as reflected in a December 1998 medical record, Daggett testified that he has "picked up" carpentry skills from family members, but is not a licensed carpenter.  (R. 1223, 1225, 1287).  He stated that he has the carpentry skills to hang a door and build a porch.  (R. 1287).

Daggett claimed that the last time he drank alcohol or used street drugs was "[f]ifteen or 20 years ago."  (R. 1237).  He admitted that he used illicit drugs "[o]ff and on" while working as a vet rep.  (R. 1281).  The ALJ informed Daggett that certain statements in his VA medical records were inconsistent with his testimony.  (R. 1242).  In response, Daggett stated that, "whatever you see on the medical records, you can go

with that." (R. 1242-43).  He further testified that he would "always tell the truth" to VA personnel while in treatment.  (R. 1244). Claimant stated that at his "worst," he used approximately $200–$300 a day worth of drugs.  (R. 1297-98).  Claimant would "trade [his] skills and talents" with drug dealers who would give him money and drugs in return.  (R. 1296-97).

Daggett testified that "[p]art of what you do with PTSD is you take the bad and you suppress it, and try not to remember it."  (R. 1224).  He tries "very hard" not to remember the "bad things" that have happened to him, like his experiences in Vietnam and his fall from a roof in 1996.  (R. 1225).  Daggett acknowledged that his PTSD is "not good" because "somewhere along the lines it seeps out, and then it comes out explosive."  (*Id.*).  He will often "bunker in," and confine himself at home for long periods of time.  (R. 1260).  In one instance, Claimant did not leave his apartment for four months.  (R. 1264).  According to Daggett, Dr. Mundt informed him that the Vietnam veterans "were trying to medicate [their] own pain because of what we had done, and what we had not forgiven ourselves for."  (R. 1298).  He asserted that "life was easy to deal with if you didn't feel anything."  (*Id.*).

Claimant started to seek treatment for his PTSD "way back in the [1980's],"when the VA hospitals "didn't know what [PTSD] was" and "didn't know what to do" about it.  (R. 1234-35).  Claimant denied substance abuse as the primary reason for his hospitalizations and cited his "mental frame of mind" and "not being able to sleep" as the basis for those hospitalizations.  (R. 1236.).  Daggett began to feel the benefit from treatment after his doctors began prescribing 200 mg of Zoloft during the day and 200 mg of Trazodon at night.  (R. 1248).  According to Claimant, as a result of these

medications, he could "get through the day without incident" and could sleep for six hours without nightmares. (*Id.*). Daggett testified that at the time of the hearing, he has been attending a PTSD outpatient therapy group. (R. 1247).

## III.    STANDARD OF REVIEW

This Court will affirm an ALJ's decision if it is supported by substantial evidence and no error of law occurred. 42 U.S.C. § 405(g) (2006); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This Court will consider the entire administrative record, but will not decide the facts anew, re-weigh the evidence, decide questions of credibility, or substitute our own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Diaz*, 55 F.3d at 305. We will "conduct a critical review of the evidence," and not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quotation omitted). Rather, while an ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Rather, an ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## IV.    ANALYSIS UNDER THE SOCIAL SECURITY ACT

In order to qualify for DIB, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry:  "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Under the first step of the disability inquiry, an ALJ must determine whether a claimant engaged in "substantial gainful activity" ("SGA").  20 C.F.R. § 404.1520(a)(4)(I) (2009).  To meet this standard, a claimant's "work activity" must be both "substantial" and "gainful."  20 C.F.R. § 404.1572; *see also Davidson v. Garnder*, 370 F.2d 803, 823 (6th Cir. 1966).  Work activity is substantial if it "involves doing significant physical or mental activities."  20 C.F.R. § 404.1572(a).  A claimant's work activity may be substantial even if a claimant works part-time, does less, gets paid less, or has less

responsibility than when he previously worked. *Id.* Gainful work activity "is the kind of work usually done for pay or profit," regardless of whether profit is realized. 20 C.F.R. § 404.1572(b). If a claimant has engaged in SGA, his claim for benefits must fail. *Palmer v. Barnhart*, 227 F. Supp. 2d 975, 976 (N.D. Ill. 2002) (citing 20 C.F.R. § 404.1520; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994)).

At the first step of the five-step inquiry, ALJ Cropper found that Daggett conducted work activity during the relevant period of disability that generated earnings above the amount presumed to indicate SGA. (R. 23). The ALJ also determined that Daggett failed to rebut the presumption of SGA. (*Id.*). Thus, she concluded that Daggett was not under a disability as defined under the Act at any time between his alleged onset date of January 15, 1984, and December 31, 1989, the date last insured. (*Id.*). Therefore, ALJ Cropper ended the five-step sequential analysis at the first step.

Claimant requests that this Court reverse the decision of the ALJ and remand his claim back to the Commissioner for further proceedings. Claimant argues that ALJ Cropper erred at step one because she (a) failed to consider certain evidence relating to his mental impairments; (b) relied on unreasonable and unsupported inferences; (c) failed to consider the full extent of the step one requirements and regulations; and (d) failed to make a credibility determination. We begin with the parties' arguments regarding the ALJ's the consideration of medical evidence.

## V.    LEGAL ARGUMENTS

### A.    Consideration of Medical Evidence at Step One

Daggett argues that the ALJ should have, but failed to, consider the medical evidence shows his work activity did not constitute SGA. In response, the Commissioner primarily relies on *Jones v. Shalala,* 21 F.3d 191, 192 (7th Cir. 1994)*,* to argue that Daggett's claim should be rejected without regard to any evidence of his mental impairments. (Comm'r Br. at 6-9, 12). In *Jones*, the Seventh Circuit recognized that where a claimant has engaged in SGA, evidence of medical impairments is irrelevant and need not be considered. *Jones*, 21 F.3d at 192. Daggett acknowledges that *Jones* stands for the proposition that "*if* a claimant is clearly engaging in SGA then the severity of his underlying condition is not at issue." (Clmt's Reply Br. at 9) (emphasis in original). However, Daggett contends that the issue is not *if*, but "*whether* he engaged in SGA." Daggett asserts that medical evidence is relevant to that determination and should have been considered by the ALJ.

To further support this argument that medical evidence should have been considered by the ALJ, Daggett relies on *Palmer v. Barnhart*, 40 Fed. Appx. 278, No. 01-4183, 2002 WL 1489422 (7th Cir. July 11, 2002) ("*Palmer*") and *Palmer v. Barnhart*, 227 F. Supp. 2d 975, 977 (N.D. Ill. 2002) ("*Palmer* II"). Because *Palmer* II involved an application for fees under the E.A.J.A., it is not relevant to our analysis.

In *Palmer*, the Seventh Circuit held that "medical evidence may be probative in situations where the record contains conflicting evidence regarding the claimant's employment activity and the ALJ must make a credibility determination in light of the entire record." *Palmer*, 40 Fed. Appx. at 284 (*citing Zurawski*, 245 F.3d at 887-88 (court lacked sufficient basis to sustain credibility determination where ALJ failed to articulate an analysis of the medical evidence)). Because the ALJ in that case "never addressed

the medical evidence" and "made no mention as to how this evidence may have shaped" his credibility determination, the court could not conclude that his decision was supported by substantial evidence. *Id*. Accordingly, it remanded with instructions that "if the ALJ determines that [claimant] engaged in substantial gainful employment . . . he must explain why the medical evidence either supports or undermines his conclusion." *Id.*

Like the ALJ in *Palmer*, ALJ Cooper was required to address the medical evidence and explain how it either supported or undermined her determination that Daggett had engaged in SGA. She complied with that requirement. ALJ Cropper provided a listing of the injuries Daggett suffered while on active military duty in Vietnam and the approximated year (1991) that he was diagnosed with PTSD. (R. 20, 23). She recognized his numerous admissions to the VA substance abuse programs and psychiatric programs. (R. 21-22). In addition, ALJ Cooper recognized that the record contains conflicting evidence regarding claimant's employment activity and engaged in a credibility determination, the two requirements for consideration of medical evidence adopted by this Circuit in *Palmer*. (R. 20-23). For example, the ALJ found Daggett's testimony that he only performed short-duration work activity was partially contradicted by his prior statements included in the VA medical records. (R. 21). Accordingly, the ALJ properly considered the medical evidence and remand is not warranted on this issue.

### B.    Inferences in the Valuation of Claimant's Work Activities

Next, Claimant argues that the ALJ relied on unsupported and unreasonable inferences relating to his income and drug use to find that his earnings exceeded the

threshold for SGA. (Clmt's Reply Br. at 6-8). We disagree. Under the guidelines, for years between 1980 and 1989, earnings in excess of $300 per month create a rebuttable presumption that Claimant engaged in SGA. 20 C.F.R. § 404.1574(b)(2)(i)(Table 1); *see also Dugan v. Sullivan*, 957 F.2d 1384, 1390 (7th Cir. 1992) (recognizing that the income guidelines create a "presumption" but do not relieve the ALJ of the "duty to develop the record fully and fairly."). Illegal activity can be considered SGA. *See e.g.* Social Security Independence and Program Improvement Act of 1994, Pub. L. No. 103-296 § 223, 108 Stat. 1469, 1499 (amending "activity" in 42 U.S.C.A. § 422(c)(2) to include "legal" and "illegal"); *Jones*, 21 F.3d at 192 ("[I]llegal activity can be 'gainful' within the meaning of the disability statute and regulations. . . ."). The claimant has the burden to rebut the presumption of SGA. *Alves v. Apfel*, 18 F. Supp. 2d 935, 938 (N.D. Ill. 1998) (citing *Jones*, 21 F.3d at 193).

Here, the ALJ concluded that Daggett "had previously admitted to using cocaine during the relevant time that would require funds significantly in excess of presumed SGA levels." (R. 23). She further found that Daggett had purchased or bartered for drugs with a value "far in excess" of the $300 threshold level. (R. 23). Daggett contends that these inferences are unsupported by the record and warrant remand. (Clmt's Reply Br. at 8).

Contrary to Claimant's argument, we find that substantial evidence supports the ALJ's findings regarding Daggett's drug use. Specifically, the ALJ relied on a VA medical document dated July 14, 1988 memorializing Daggett's report that he had been using cocaine "regularly" during the preceding four years, and that he had been "freebasing" cocaine valued at "approximately $1500/month." (R. 22). The ALJ also

noted that in 1991 Daggett reported that he had been "smoking cocaine" on a daily basis for the past three years, using $100–$125 worth of cocaine "on a slow day." (*Id.*). The ALJ credited Daggett's testimony that at his "worst," he used $200–$300 of drugs per day. (R. 23). In addition, the ALJ referenced Daggett's testimony that he typically "traded [his] skills and talents for money and drugs." (*Id.*). It is permissible for an ALJ to consider this type of testimony. *See Gallegos v. Shalala*, No. CV93-1519-JR, 1993 WL 404157, *2 (C.D. Cal. Aug. 30, 1993) (holding that an exchange of a claimant's efforts as a middle-man for heroin is an "in-kind" payment that qualifies as gainful activity). Because ALJ Cropper's finding that Daggett had presumably engaged in SGA based on the inference that his drug use amounted to a value "far in excess" of the $300 earnings threshold is supported by substantial evidence, it does not warrant remand.

Claimant also argues that the ALJ's determination that his earnings from work activity exceeding the SGA level is contradicted by evidence in the record. (Clmt's Reply Br. at 7-8). Specifically, Claimant argues that the ALJ ignored his testimony that he was given "gifts" of drugs from dealers, used his savings to purchase drugs, and received assistance from his nine brothers and sisters. (*Id.* at 7). Even assuming that this evidence suggests that Claimant did not generate earnings above the presumed SGA threshold level, it does not require remand. As discussed above, substantial evidence supports the ALJ's determination. And it is well established that we must affirm the ALJ's decision if it is supported by substantial evidence. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009); *see also Lopez*, 336 F.3d at 539 (recognizing that the Seventh Circuit has cautioned the district courts not to reweigh evidence, resolve conflicts, decide questions of credibility or substitute our judgment for that of the

Commissioner)(quotations omitted).

ALJ Cropper concluded that Daggett was "not willing" to answer her questions about his substance history. (R. 22). She also noted that Daggett eventually testified that the reports he made to VA personnel were truthful. (*Id.*). Indeed, the record shows that during the hearing, the ALJ informed Daggett that the statements about his drug use reflected in his VA medical records were inconsistent with his testimony that he did not use illicit drugs in the last 15 years. (R. 1242). Daggett responded, "whatever you see on the medical records, you can go with that." (R. 1242-43). This further supports ALJ Cropper's inference that Daggett generated earnings from work activity "far in excess" of the presumed SGA level. In sum, we hold that the ALJ's inferences at issue are reasonably drawn from and supported by substantial evidence in the record. Therefore, we do not remand on these grounds.

### C.     Requirements and Regulations Under Step One

Daggett next argues that ALJ Cropper erred by failing to consider the full extent of the requirements and regulations regarding SGA. Specifically, Daggett argues that ALJ Cropper erred by failing to consider evidence regarding his self-employment status and unsuccessful work attempts. The regulations require an ALJ to consider the following six factors to determine whether a claimant's work activity, by being both gainful and substantial, constitutes SGA: (1) the claimant's earnings, (2) the nature of the work performed, (3) how well the claimant performs the work, (4) whether the work is done under special conditions, (5) whether the claimant is self-employed, and (6) the amount of time spent working. 20 C.F.R. §§ 404.1572–404.1574. Where a claimant's prior work activities were as an employee, an ALJ's primary consideration for SGA

determination purposes is the claimant's earnings.  20 C.F.R. § 404.1574(a)(1).

However, if a claimant was self-employed, the ALJ must consider additional evaluation

guidelines to determine if the claimant engaged in SGA.  *See* 20 C.F.R. § 404.1575

(setting forth additional provisions that, where appropriate, should be considered in

connection with an application for disability benefits).  This is because "the measure of

'substantial gainful activity' for a self-employed person is that person's activities and

their value, not [his] income alone."  *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir.

1997) (citing 20 C.F.R. § 404.1575).  The regulations further provide that an

"unsuccessful work attempt" does not constitute SGA.  20 C.F.R. §§ 404.1574(c),

404.1575(d).

Daggett challenges the ALJ's failure to determine if he worked as a self-

employed person.  He relies on his testimony to show that some of his work activity

constituted self-employment work.  (Clmt's Reply Br. at 4).  We also note that, in her

decision, the ALJ relied on Daggett's report to VA personnel that he worked as a "self-

employed journeyman carpenter."  (R. 21).  However, it is not clear if the ALJ

considered Daggett's work activity as that of an employee or a self-employed person.

As Claimant recognizes, the ALJ did not engage in the self-employment evaluation

mandated by the regulations.  *See* 20 C.F.R. § 404.1575 (outlining three tests that must

be applied to determine if a self-employed claimant engaged in substantial gainful

activity).  ALJ Cropper's failure to evaluate Daggett's work efforts under the self-

employment tests, or to explain why that evaluation is not appropriate in this case,

requires reversal.  *See Delmas v. Barnhart*, No. 1:04-CV-181, 2005 U.S. Dist. LEXIS

6574, at *13-14 (N.D. Ind. Apr. 14, 2005) (finding an ALJ's legal analysis "woefully

inadequate" where he incorrectly treated a self-employed claimant as an employee); *see also Johnson v. Sullivan*, 929 F.2d 596, 597-98 (11th Cir. 1991) (per curiam) (recognizing that "[s]elf-employment is evaluated differently from other forms of employment in that income is less reliable as an indicator of the substantial nature of the work."). This Court cannot make an independent finding as to claimant's alleged self-employment. *See Diaz*, 55 F.3d at 305 (recognizing that "[w]e cannot subsitute our judgment for that of the [administration] by reevaluating the facts"). On remand, the ALJ must determine if any of Daggett's work activity is that of a self-employed person. If so, the ALJ must evaluate claimant's work by applying the three tests set forth in 20 C.F.R. § 404.1575 (a)(2).

Next, Daggett argues that the ALJ erred by failing to determine if his work efforts constituted "unsuccessful work attempts." (Clmt's Opening Br. 14-15). Under the regulations, work that a claimant is "forced to stop or to reduce below the substantial gainful activity level after a short time because of [an] impairment" is generally considered an unsuccessful work attempt. 20 C.F.R. § 404.1574(a)(1). The concept of an unsuccessful work attempt applies to both the employee and self-employment context. *See* 20 C.F.R. §§ 404.1574(c), 404.1575(d). A claimant's earnings from an unsuccessful work attempt are excluded from an ALJ's SGA analysis. *Royster v. Barnhart*, No. 02 C 50431, 2003 WL 22902571, at *8 (N.D. Ill. Dec. 9, 2003) (citing 20 C.F.R. § 404.1574(a)).

Claimant contends that all of his jobs lasted no more than six weeks and are all unsuccessful work attempts. In the alternative, Daggett argues that the temporary nature of these jobs constitutes a special condition under which all of his jobs are

unsuccessful work attempts.  Under the regulations, work which lasted three months or

less will be an unsuccessful work attempt if it "ended, or was reduced below substantial

gainful activity, because of [an] impairment or because of the removal of special

conditions which took into account [the] impairment" and permitted claimant to work.

20 C.F.R. §404.1575(d)(4); *see also Sample v. Shalala*, 999 F.2d 1138, 1142 (7th Cir.

1993).  Accordingly, claimant's two arguments are essentially the same.

To support his contention that none of his jobs lasted for more than four to six

weeks, claimant relies on his own testimony.  (Clmt's Opening Br. 2-3).  He argues that

this is because of his PTSD, which essentially precludes any long term employment.

Daggett also cites Dr. Mundt's June 14, 2004 observation that claimant "cannot sustain

any activity or involvement across time with the kind of consistency that would be

required by even the most undemanding of jobs."  (R. 626).  Thus, claimant argues that

his prior "jobs, which by their very nature are temporary, may constitute the type of

special condition which . . . require finding the job to have been an unsuccessful work

attempt."  (Clmt's Reply 5).  In support of this conclusion, claimant cites *Andler v.

Chater,* 100 F.3d 1389 (8th Cir. 1996), a case involving a claimant with PTSD who

worked as a temporary carpenter's helper for two consecutive summers.  In *Andler,* the

claimant performed his job during periods of remission in between hospitalizations and

under a special condition – weekly visits from his VA counselor.  *Id.* at 1393.

Considering those facts and the "overwhelming evidence" that claimant was incapable

of performing work for sustained periods, the Eighth Circuit found a "special condition

under the facts of th[at] case.*"  Id.* at 1393-94.  Because claimant has not shown that

such facts are present in this case, *Andler* does not guide our analysis.

Here, the ALJ recognized that the record contains conflicting evidence regarding the length of claimant's employment. (R. 21). As discussed above, she found that claimant's testimony was "partially contradicted by his prior inconsistent statements to VA personnel." (R. 21). The ALJ also relied on claimant's "expensive daily cocaine habit" and use of drugs with a value "far in excess of $300 per month." (R. 23); *see also Washington v. Apfel*, 57 F. Supp. 2d. 601, 606 (N.D. Ill. 1999) (relying on evidence that claimant used between $25 and $200 worth of drugs per day to create a rebuttal presumption of substantial gainful activity). Because substantial evidence supports her conclusion, we cannot find that ALJ Cropper erred in determining that claimant "failed to rebut the presumption that he was engaged in long-term work activity that generated earnings at or apparently far above the presumed SGA level." (R. 23).

### D. Credibility

Claimant argues that remand is warranted because ALJ Cropper failed to make any credibility determination. When evaluating the credibility of statements supporting a social security application, an ALJ must articulate specific reasons for her decision, supported by evidence in the record. *See Zurawski*, 245 F.3d at 887. This Court must first make certain that a credibility determination "actually" has been made. *Schroeter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992) (internal citations omitted). If so, the ALJ's credibility determination is afforded "considerable deference." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Because the ALJ is best positioned to evaluate the credibility of a witness, we will reverse the ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

ALJ Cropper's decision does not contain an explicit credibility finding. The lack of

the words "credible" or "credibility" in an ALJ's decision does not necessarily mean that a credibility determination is missing. *See, e.g.*, *Hereford v. Shalala*, No. 93-3299, 1995 WL 94902, at *9 (7th Cir. Mar. 7, 1995). The Commissioner concedes that ALJ Cropper did not conduct a credibility analysis as to Daggett's subjective claims of "symptoms including pain" under 20 C.F.R. § 404.1529. However, it argues that the ALJ made a different type of credibility determination that is appropriate in this case. (Comm'r Br. at 10 n.6). The ALJ found that "Claimant's testimony that he only rarely performed very short-duration work activity between 1984 and 1989 is partially contradicted by his prior inconsistent statements to VA personnel, made in the treatment context as early as 1992." (R. 21). Thus, the ALJ assessed the credibility of Claimant's testimony as to his work history and drug use.

Next, we must determine if the ALJ's credibility determination is supported by the record. An ALJ's credibility determination must be based on the "entire case record." Social Security Ruling ("S.S.R.") 96-7p (7/2/96); 1996 SSR LEXIS 4. A credibility determination that is "sufficiently supported" by the record is not "patently wrong." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993). In considering the claimant's credibility, an ALJ is to consider multiple factors including claimant's daily activities such as work history. *See, e.g. Scheck v. Barnhart*, 357 F.3d 697, 703 (2004) (finding that the ALJ used proper procedure to determine claimant's credibility by considering multiple factors including claimant's daily activities); *McCurrie v. Astrue*, 2010 U.S. Dist. Lexis 5677, *19-22 (January 25, 2010) (finding that an ALJ's credibility determination was proper where he "based his credibility determination on numerous factors," including claimant's work history and alcohol use.).

Despite Claimant's argument to the contrary, the ALJ specified in her decision the evidence in the record that she did not find credible. For example, ALJ Cropper cited records of Claimant's December 1992 admission to a VA substance treatment program, where he reported being "laid off a job" approximately a week earlier. (R. 21). The ALJ also relied on additional evidence from this December 1992 admission where Daggett reported that he "helped in [his] father's trucking business" from 1986 to 1988, and "[h]elped [his] mother rehab old HUD homes" from 1988 to 1991. (*Id.*). ALJ Cropper discussed Claimant's history of substance abuse to support her credibility finding, she noted that:

> I attempted to ask claimant during the hearing about his substance history, but he apparently was not willing to answer my questions truthfully, instead testifying that he had not used any alcohol or street drugs during the preceding 15 years, and that his remote drug habit was supported with "gifts."

(R. 22). Thus, the ALJ specified the evidence that she did not find credible.

Daggett also contends that ALJ Cropper erred by failing to explain why she did not find credible his testimony that all of his jobs were short-lived due to the "demons running around" in his head. We do not credit this argument. An ALJ is not required to address every piece of evidence and testimony. *Carroll v. Barnhart*, 291 F. Supp. 2d 783, 798 (N.D. Ill. 2003) (citing *Stephens*, 766 F.2d at 287). Rather, an ALJ must support her credibility determination with evidence in the record and specific reasons sufficiently articulated to make clear to the reviewing court the weight she gave to the individual's statements, and the reasons for that weight. *See* S.S.R. 96-7p (7/2/96), 1996 SSR LEXIS 4; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007). Here, ALJ Cropper made a credibility determination and sufficiently articulated her

reasoning by pointing to specific evidence in the record. Therefore, we cannot conclude that the ALJ's credibility determination was "patently wrong."

## VI. CONCLUSION

For the reasons stated above, Daggett's motion for summary judgment is granted in part and denied in part, the Commissioner's motion for summary judgment is denied, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion, specifically for a determination as to Claimant's alleged self-employment status. It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: May 5, 2010**